UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

\* \* \* \* \*

| | |
|---|---|
| ROBERT BLAIR, | ) |
|     Plaintiff, | ) |
|     v. | ) Case No. 12-cv- |
| DEVRY, INC. and ROSS UNIVERSITY SCHOOL OF MEDICINE; DOES I-XX, inclusive, | ) |
|     Defendants. | ) |

## COMPLAINT
(Jury Demanded)

COMES NOW, Plaintiff, ROBERT BLAIR, by and through his attorney of record, Jason J. Bach, Esq. of The Bach Law Group, PLLC, and hereby complains and alleges against the above-named Defendants, and each of them, based upon knowledge, information and a reasonable belief derived therefrom, as follows:

## PARTIES

1. Plaintiff, ROBERT BLAIR, is currently a resident of Cook County, State of Illinois, and at all relevant times, was a student at the Ross University School of Medicine.

2. Defendant, DEVRY, INC., is a Delaware corporation with its principal place of business in Cook County, Illinois, with C T Corporation System as its registered agent, located at 208 So. LaSalle St., Suite 814, Chicago, Illinois 60604.

3. Defendant, ROSS UNIVERSITY SCHOOL OF MEDICINE (hereinafter referred to as "Ross"), is an educational institution of higher learning and subsidiary of DEVRY, INC. Ross has two campuses, with main campus at P.O. Box 266, Roseau, Commonwealth of Dominica, West Indies and secondary campus located at 7000 S.W. 62nd Avenue, PH-A, Miami, FL 33143.

4. That the true names or capacities, whether individual, corporate, associate or otherwise, of Defendants DOES I through XX are unknown to Plaintiff, who therefore, sues said Defendants by such fictitious names.

5. Plaintiff is informed and believes and thereon alleges that each of the Defendants designated herein as DOES are responsible in some manner for the events and happenings referred to in this action and proximately caused damages to Plaintiff as herein alleged, and that Plaintiff will ask leave of this Court to amend this Complaint, to insert the true names and capacities of said Defendants, and when the same have been ascertained to join such Defendants in this action.

## JURISDICTION & VENUE

6. This Court has jurisdiction over the claims set forth in this action pursuant to 28 U.S.C. §1331 (federal question) and 18 U.S.C. §1962 (RICO).

7. Supplemental jurisdiction over Plaintiff's pendent state law claims is invoked pursuant to 28 U.S.C. §1367, as the claims arise out of the same transactions and occurrences as Plaintiff's federal claim.

8. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. §1391 in that the Plaintiff and Defendants are located in this district.

9. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. §1391 in that the Defendant, DeVry, Inc., owns and operates nine schools in this district and Ross regularly conducts informational seminars on its program in Illinois.

10. Suit in Illinois would not be unduly burdensome for Defendants.

## GENERAL FACTUAL ALLEGATIONS

11. Plaintiff enrolled as a student at the Ross University School of Medicine beginning in the Spring 2005 semester.

12. Plaintiff completed his first two semesters at Ross without incident and in good academic standing.

13. In Plaintiff's third semester at Ross, he did not receive $2,000.00 from his student loan refund check, which Defendants later told Plaintiff was stolen by and employee of Ross University.

14. As a result, Plaintiff was left with insufficient funds to complete his third semester at Ross. During the length of his third semester, Plaintiff had no money to pay bills, rent, and was forced to constantly worry about his financial situation rather than focus on his studies as a medical

student. Naturally, Plaintiff fell behind on his studies and was unable to fully participate in medical school, unlike his fellow class mates who did not have their student aid stolen by employees of the University.

15. Due to Ross' failure to resolve Plaintiff's issue with his student aid, he was left with insufficient funds to complete the third semester. As a result, Plaintiff could not afford to purchase books, could not afford to pay rent or bills, and could not even afford to eat. Plaintiff fell behind on his studies in the third semester and was forced to repeat both his third semester and fourth semester because a student's performance in both the third and fourth semesters are awarded one final grade with performance in the third semester accounting for 55% of the final grade and fourth semester accounting for 45% of the final grade.

16. Finally, in March 2006, Defendants seemingly addressed Plaintiff's financial aid issue, claiming that an employee stole the student loan funds from Plaintiff. Defendants refunded Plaintiff's money, and allegedly terminated the employee, but not before Plaintiff's medical school education was severely disrupted.

17. With his student aid issues temporarily resolved, Plaintiff repeated his fourth semester and successfully completed his classes.

18. But Defendants' egregious actions regarding Plaintiff's student aid resurfaced in Plaintiff's fifth semester, which he was to complete at the Advanced Introduction to Clinical Medicine at the Ross University School of Medicine in Miami, Florida.

19. Plaintiff obtained two student loans totaling $28,000.00 to continue his medical training. In order for the lender to release the loans, they required Ross to certify Plaintiff's enrollment at the University.

20. For reasons unknown to Plaintiff at this time, and in direct violation of Defendant's obligations to Plaintiff, Defendants refused to certify Plaintiff's enrollment at the University, despite multiple requests from both Plaintiff and the lenders, thereby causing Plaintiff to again have insufficient funds to complete his medical education.

21. Throughout Plaintiff's fifth semester, he was at a severe disadvantage as he could not afford transportation to and from class, he did not have money for rent or bills, he lost valuable study

time, and could not afford to eat.

22. Due to Defendants actions which put Plaintiff at a severe disadvantage, Plaintiff was again unable to focus on his studies as a medical student and was unable to put in the necessary study time to complete his Step 1 medical licensing examination. As a result, Plaintiff failed the Step 1 examination on his first attempt.

23. Prior to attempting the Step 1 examination a second time, Plaintiff requested that Defendants allow him to remediate the fifth semester, due to his financial aid issues that were directly and intentionally caused by Defendants misappropriation and mismanagement of financial aid. Ross students acquire the information and knowledge required for the Step 1 examination, in large part, during the fifth semester. Yet, Defendants refused Plaintiff's request and forced Plaintiff to take the examination without remediation.

24. On September 29, 2009 Plaintiff was informed by Defendant Ross that he had passed his Step 1 examination. The correspondence stated "Congratulations on passing! You are on your way to beginning your clinical rotations!"

25. Suddenly, the first week of December 2009, Plaintiff was informed by Defendant Ross that he had not passed the prior Step 1 examination, and on December 10, 2009 Defendants sent Plaintiff a letter dismissing him from the medical school. However, the letter was dated nearly 11 months prior: January 20, 2009.

26. Plaintiff appealed his wrongful dismissal from the medical school, requesting reversal of the dismissal in December 2009, and throughout numerous conversations and correspondences with Defendants through March 2011. Defendants led Plaintiff to believe they were still considering his appeal during that time.

27. The dismissal of Plaintiff for failing the Step 1 examination on his second attempt is in spite of the fact that other Ross students were permitted third and fourth attempts to pass the Step 1 examination, and Plaintiff was initially told that he would have the same opportunity.

28. On or about September 2011 Plaintiff learned that Defendants had been engaged in a pattern of deceptive acts whereby they would mislead Plaintiff into believing that he would be permitted a fair opportunity to complete medical school, and enter into clinical rotations, all in

attempt by Defendants to obtain Plaintiff's financial aid loans, secured through the U.S. Department of Education.

29. In August 2010 the U.S. Government Accountability Office issued report GAO-10-948T, titled "For-Profit Colleges: Undercover Testing Finds Colleges Encouraged Fraud in Deceptive and Questionable Marketing Practices." As a result, suit was brought against Defendants, in this district, by shareholders of Defendants, establishing that DeVry, doing business as Ross, "failed to disclose that the Company had been engaging in abusive and fraudulent recruiting and financial aid lending practices, thereby increasing DeVry's student enrollment and revenues."[1]

30. As a result of Defendants' intentional and wrongful arbitrary and capricious actions, Plaintiff was removed from the medical school, forever tarnishing his educational transcript and record, as well as causing severe psychological and physical injuries, all in violation of the Ross University School of Medicine Student Handbook, and the Ross University School of Medicine Academic Catalog.

31. As a result of the above, Defendants actions, and each of them, they have wrongly caused Plaintiff to be sanctioned and removed from the University and for the above-noted notations to be wrongly placed on his record, depriving him of the opportunity to obtain an education and further his career, and inflicting emotional distress and physical injury, creating more than $200,000 in student loans for Plaintiff, all damaging him in an amount in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00).

## RICO ALLEGATIONS

32. Defendants have engaged in a fraudulent scheme, common course of conduct and conspiracy to use deceptive and otherwise questionable sales and marketing practices to increase enrollment at the for-profit college and receive increased tuition payments from students who acquired funds through Title IV of the Higher Education Act of 1965.

33. Defendants have participated in such fraudulent practices as misrepresenting to prospective students, and students, information about the student's likelihood of success, the college's accreditation, graduation rates, its students' prospective employment and salary

---

[1] *Boca Raton Firefighters, et al. v. DeVry Inc.*, et al., 1:10-cv-07031

qualifications, duration and cost of the program, and financial aid.

34. To achieve these goals, Defendants have disseminated misleading marketing materials, engaged in hard-sell sales and marketing tactics, paid commissions and bonuses for enrolling students and induced prospective students into submitting applications for Title IV student loans.

35. As a result of their fraudulent scheme and conspiracy, Defendants were able to extract tuition payments, fees, costs of books and other material, and other revenues from Plaintiff.

36. Upon Plaintiff's current knowledge and belief the Defendants, other entities and colleges owned and operated by Defendants, representatives and/or agents of Defendants that have earned commissions for enrolling students who applied for federal student aid, and any others that have facilitated the enrollment and receipt of federal student aid for students constitute one or more groups of persons and entities associated in fact, which is hereinafter referred to as the "Enterprise."

37. The Enterprise is an ongoing and continuing organization consisting of both corporations and individuals associated for the common or shared purpose of using deceptive and otherwise questionable sales and marketing practices to increase enrollment at the for-profit college and receive increased tuition payments from students who acquired funds through Title IV of the Higher Education Act of 1965.

38. The Enterprise functions by operating educational institutions, which award degrees and/or vocational and educational training and certifications. Some of the services offered and information provided to prospective students is legitimate and non-fraudulent. However, Defendants, through the Enterprise, have engaged in a pattern of racketeering activity which also involves a fraudulent scheme to increase tuition revenue and commission revenue to sales and marketing agents, which includes misleading students as long as possible in order to receive the maximum amount of financial aid.

39. The Enterprise engages in and affects interstate commerce because it involves activities across state boundaries, such as disseminating misleading marketing materials, misrepresenting to prospective students, and current students, information about the student's likelihood of success in the program, the college's accreditation, graduation rates, its students'

prospective employment and salary qualifications, duration and cost of the program, and financial aid for enrolling students who applied for federal student aid.

40. Within the Enterprise, there is a common communication network by which co-conspirators share information on a regular basis. The Enterprise uses this common communication network for the purpose of disseminating misleading marketing materials, misrepresenting to prospective students information about the college's accreditation, graduation rates, its students' prospective employment and salary qualifications, duration and cost of the program, and financial aid to enroll students who applied for federal student aid.

41. Each participant in the Enterprise has a systematic linkage because there are contractual relationships, financial ties, and continuing coordination of activities. Through the Enterprise, Defendants engage in consensual decision making to implement their fraudulent scheme and to function as a continuing unit for the common purpose of extracting tuition payments and encouraging student to apply for federal student aid. Furthermore, the Enterprise functions as a continuing unit with the purpose of assisting with, perfecting, and furthering their wrongful scheme.

42. While Defendants participate in and are members of the Enterprise, they also have a separate and distinct existence.

43. Defendants fail to disclose and/or misrepresent to prospective students, and current students, information about the student's likelihood of success in the program, the college's accreditation, graduation rates, its students' prospective employment and salary qualifications, duration and cost of the program, and financial aid. To limit the information that prospective and current students receive, Defendants have to maintain over information prospective students get at the point of sale. Each Defendant exercises substantial control over the direction of the Enterprise by:

(a) designing and distributing marketing and sales materials that do not disclose material information about the student's likelihood of success, the college's accreditation, graduation rates, its students' prospective employment and salary qualifications, duration and cost of the program, and financial aid;

(b) developing uniform sales and marketing materials, high-pressure sales techniques and

scripted sales presentations including but not limited to materials developed by Defendants for use by sales agents;

(c) requiring sales agents to use standardized sales and marketing materials, high-pressure sales techniques and scripted sales presentations developed by Defendants to market and induce students to enroll in the college and apply for federal student aid;

(d) rewarding sales agents with perks and commissions for enrolling a student in the college and inducing them to apply for and receive federal student aid;

(e) accepting students into the programs who Defendants knew were not qualified for the program and who Defendants knew would not complete or graduate from the program.

44. Although Defendants enroll students who are qualified for the programs and who can pay tuition without federal student aid, the Enterprise targets students specifically who require federal student aid to pay for their tuition.

45. At all relevant times, each participant in the Enterprise was aware of the scheme to induce students to enroll in the college and apply for federal student aid, was a knowing and willing participant in the scheme, and reaped profits therefrom.

46. The Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged.

47. Defendants have directed and controlled the ongoing organization necessary to implement their scheme and illicit business practices at meeting and through communications of which Plaintiff cannot know because all such information lies in Defendants' hands.

48. Each Defendant and member of the conspiracy, with knowledge and intent, has agreed to the overall objectives of the conspiracy and participated in the common course and conduct to commit acts of fraud to induce students to enroll in the college and apply for federal student aid knowing that the prospective students were not qualified for the program and who Defendants knew would not complete or graduate from the program and knowing that some of the students who were induced into applying for federal student aid would not qualify for student loans or whom did not require them to pay for the college tuition.

49. For the conspiracy to succeed, each Defendant and co-conspirator had to agree to

implement and use similar devices and fraudulent tactics against their intended targets.

50. Many instances of common conduct, activity, and similar facts evidence the presence of a conspiracy and exist among all Defendants and co-conspirators, including but not limited to similar advertisements and marketing materials with vague, misleading, and incomplete language about the college's accreditation, graduation rates, its students' prospective employment and salary qualifications, duration and cost of the program, and financial aid and similar plans and methods, and tactics for agents to solicit and market to prospective students.

51. As a result of the conspiracy, Plaintiff enrolled in the college, made tuition payments and applied for federal student aid which he otherwise would not have done.

52. Defendants used thousands of mail and interstate wire communications to create and manage their fraudulent scheme through virtually uniform misrepresentations, concealments and material omissions, including misleading marketing materials, mass mailings, phone calls, advertisements, agreements, correspondence, websites, commission payments.

53. Defendants' fraudulent use of the mails or wires included communications regarding the college's accreditation, graduation rates, its students' prospective employment and salary qualifications, duration and cost of the program, and financial aid, which were sent by Defendants to each other, Plaintiff and third parties via U.S. mail, commercial carrier, wire, or other interstate electronic media.

54. Defendants' corporate headquarters have communicated by U.S. mail and by facsimile with various regional offices, colleges, subsidiaries, divisions and other insurance entities in furtherance of their schemes.

55. Defendants' uniform acts of concealment and omissions were knowing and intentional and made for the purpose of deceiving Plaintiff and other similarly situated individuals into enrolling into Defendant's programs and applying for federal student aid knowing that the prospective students were not qualified for the program and who Defendants knew would not complete or graduate from the program and knowing that some of the students who were induced into applying for federal student aid would not qualify for student loans or whom did not require them to pay for the college tuition.

56. Defendants either knew or recklessly disregarded that their misrepresentations and omissions were relied upon by Plaintiff as shown by the tuition payments Plaintiff made to Defendants and federal student aid which Plaintiff received.

## FIRST CAUSE OF ACTION

*VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §1962, et seq.*

57. Paragraphs 1 through 56, inclusive are incorporated by reference.

58. As a direct and indirect result of Defendants' conduct as described above, substantial income was generated, received by a came under the control of Defendants. Defendants used that income to establish and/or operate the Enterprise, which was engaged in interstate and foreign commerce. Therefore, Defendants violated 18 U.S.C. §1962(a).

59. Defendants, through the conduct described above, acquired, maintained and exercised control over the Enterprise, which was engaged in or affected interstate and foreign commerce. Therefore, Defendants violated 18 U.S.C. §1962(b).

60. Defendants have conducted or participated, directly or indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, as defined by 18 U.S.C. §1961(5), and are therefore in violation of 18 U.S.C. §1962(c).

61. At all relevant times, Defendants were "persons" within the meaning of 18 U.S.C. §1961(3), because each was capable of holding a legal or beneficial interest in property.

62. The Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. §1961(4), as individuals and other entities associated in fact for the common purpose of engaging in Defendants' profit making scheme.

63. The Enterprise was created and/or used as a tool to carry out the elements of Defendants' illicit scheme and pattern of racketeering activity. The Enterprise has ascertainable structures and purposes beyond the scope and commission of Defendants' predicate acts and conspiracy to commit such acts. The enterprise is separate and distinct from Defendants.

64. The Enterprise has engaged in, and its activities affected, interstate and foreign commerce by soliciting, marketing to, and enrolling thousands of persons within and from outside

of the United States.

65. The Enterprise actively disguised the nature of Defendants' wrongdoing and concealed or misrepresented Defendants' participation in the conduct of the Enterprise, including failing to disclose to Plaintiff and other prospective students the testimony from the United States Government Accountability Office released on August 4, 2010 regarding for-profit colleges encouraging fraud and engaging in deceptive and questionable marketing practices, in order to maximize profits while minimizing their exposure to criminal and civil penalties.

66. Each Defendant exerted substantial control over the Enterprise, and participated in the operation and managed the affairs of the Enterprise as described herein.

67. Defendants have committed or aided and abetted the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§1341 and 1343, within the past 10 years. The multiple acts of racketeering activity which defendants committed and/or conspired to, or aided and abetted in the commission of, were related to each other, pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

68. Defendants' predicate acts of racketeering within the meaning of 18 U.S.C. §1961(1) include, but are not limited to:

(a) **Mail Fraud**: Defendants have violated 18 U.S.C. §1341 by sending or receiving materials via U.S. mail or commercial interstate carriers for the purpose of executing their scheme to increase enrollment at the for-profit college and receive increased tuition payments from students who acquired funds through federal student aid by means of false pretenses, misrepresentations, promises, and/or omissions. The materials include, but are not limited to: advertisements, marketing brochures, applications, contracts, sales presentation scripts, training manuals, videotapes, correspondence, prospective student lead lists, commission payments, reports, data, summaries, statements, and other materials.

(b) **Wire Fraud**: Defendants have violated 18 U.S.C. §1343 by transmitting and receiving materials by wire for the purpose of executing their scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and/or omissions. The materials transmitted and/or received include, but are not limited to those mentioned in subsection (a) above.

69. Many of the precise dates of Defendants' fraudulent uses of the U.S. mail and wire facilities have been deliberately hidden and cannot be alleged without access to the defendants' books and records. Indeed, the success of the Defendants' scheme depends upon the secrecy, and Defendants have withheld details of the scheme from Plaintiff. Generally, however, Plaintiff can describe the occasions on which the predicate acts of mail and wire fraud would have occurred, and how those acts were in furtherance of a scheme. They include thousands of communications to perpetuate and maintain the scheme, including, among other things, advertisements, marketing brochures, applications, contracts, sales presentation scripts, training manuals, videotapes, correspondence, prospective student lead lists, commission payments, reports, data, summaries, statements, and other materials.

70. The materials sent or received by defendants via the U.S. mail, commercial carrier, with or other interstate electronic media, contained misrepresentations and omissions regarding the college's accreditation, graduation rates, its students' prospective employment and salary qualifications, duration and cost of the program, and financial aid, and omission of testimony from the United States Government Accountability Office released on August 4, 2010 regarding for-profit colleges encouraging fraud and engaging in deceptive and questionable marketing practices.

71. Defendants knowingly and intentionally made these misrepresentations, acts of concealment and failures to disclose so as to deceive Plaintiff. Defendants either knew or recklessly disregarded that these were material misrepresentations and omissions, and Plaintiff relied on the misrepresentations and omissions as set forth herein.

72. Defendants have obtained money and property belonging to Plaintiff as a result of these statutory violations. Plaintiff has been injured in his property by Defendants' overt acts or mail and wire fraud, and by their aiding and abetting each other's acts of mail and wire fraud.

73. In violation of 18 U.S.C. §1962(d), Defendants conspired to violate 18 U.S.C. §1962(c), as described herein. Various other persons, firms and corporations, not named as Defendants in this Complaint, have participated as co-conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy.

74. Each Defendant aided and abetted violations of the above laws, thereby rendering

them indictable as a principle in the 18 U.S.C. §§ 1341 and 1343 offenses pursuant to 18 U.S.C. §2.

75. Plaintiff has been injured in his property by reason of Defendants' violations of 18 U.S.C. §1962 (a) and (d), including but not limited to lost access to needed funds; necessary and concealed fees, charges and penalties that he would not have otherwise incurred; expenses to attend college, delay damages, expenses hire an attorney. In the absence of Defendants' violations of 18 U.S.C. §1962 (a) and (d), Plaintiff would not have incurred these costs and expenses, or he would have incurred less.

76. Plaintiff relied, to his detriment, on Defendants' fraudulent misrepresentations and omissions, which were made by means of Web sites, mass mailings, newspaper advertisements, telephone calls, marketing materials and virtually uniform representations or omissions. Plaintiff's reliance is evidenced by the tuition payments made to Defendants.

77. Plaintiff's injuries were directly and proximately caused by Defendants' racketeering activity.

78. Defendants knew Plaintiff relied on their representations and omissions and Defendants knew that Plaintiff would incur substantial costs as a result.

79. Under the provisions of 18 U.S.C. §1964(c), Plaintiff is entitled to bring this action and to recover treble damages, the costs of bringing this suit and reasonable attorneys' fees.

80. Defendants are accordingly liable to Plaintiff for three times his actual damages as proved at trial plus interest and attorneys' fees.

## SECOND CAUSE OF ACTION

### *VIOLATIONS OF 20 U.S.C. § 1092, et al.*

81. Paragraphs 1 through 80, inclusive are incorporated by reference.

82. Defendant is an educational institution eligible to receive Title IV funds and is subject to the provisions of 20 U.S.C. §§ 1092 and 1094.

83. The misrepresentations or deceptive omissions of material fact set forth herein above regarding the college's accreditation, graduation rates, its students' prospective employment and salary qualifications, duration and cost of the program, and financial aid constitute actions prohibited by 20 U.S.C. § 1092.

84. Therefore, Plaintiff is entitled to statutory damages for each misrepresentation or deceptive omission of material fact set forth herein above pursuant to 20 U.S.C. § 1094.

85. As a result of the statutory violations committed against the Plaintiff, he has been damaged in an amount in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00).

86. It has been necessary for the Plaintiff to obtain the services of an attorney to prosecute this action, and Plaintiff is entitled to an award of attorney's fees and costs of suit incurred herein.

### THIRD CAUSE OF ACTION

### *BREACH OF CONTRACT*

87. Paragraphs 1 through 86, inclusive are incorporated by reference.

88. Plaintiff has an express and implied contract with Defendants in connection with rights explicitly guaranteed by Ross University, pursuant to the Ross University School of Medicine Student Handbook, and the Ross University School of Medicine Academic Catalog.

89. The actions of Defendants constitute a breach of the express and implied contract.

90. As a result of the breach committed against the Plaintiff, he has been damaged in an amount in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00).

91. It has been necessary for the Plaintiff to obtain the services of an attorney to prosecute this action, and Plaintiff is entitled to an award of attorney's fees and costs of suit incurred herein.

### FOURTH CAUSE OF ACTION

### *NEGLIGENCE / NEGLIGENT HIRING, TRAINING, & SUPERVISION*

92. Paragraphs 1 through 91, inclusive, are incorporated by reference.

93. At all times material and relevant herein, the Defendants had a duty to not violate the Constitutional rights of their students.

94. At all times relevant herein, Defendants had a duty not to hire individuals with a propensity towards committing unlawful acts against those who lawfully go about their business, and to adequately train and supervise their agents, officers, and employees.

95. At all times relevant herein, the Defendants had a duty to protect the public, such as Plaintiff, from the illegal actions of their own agents, officers, employees and others. In addition, Defendants had a duty not to hire individuals with a propensity towards committing unlawful acts

against the public, and to adequately train and supervise their employees.

96. Defendants, and each of them, breached their respective duties, and are therefore negligent and liable to the Plaintiff, who has suffered serious economic loss, loss of reputation, loss of daily and future income, and to incur severe financial obligations in order to retain attorneys, as well as other painful injuries, deprivation of his liberty, invasion of his privacy, grievous mental suffering, all to his damage in an amount in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00).

97. It has been necessary for the Plaintiff to obtain the services of an attorney to prosecute this action, and Plaintiff is entitled to an award of attorney's fees and costs of suit incurred herein.

## FIFTH CAUSE OF ACTION

### *INTENTIONAL AND NEGLIGENT INFLICTION OF SEVERE MENTAL DISTRESS*

98. Paragraphs 1 through 97, inclusive, are incorporated by reference.

99. As a result of Defendants' intentional and negligent conduct and omissions, Plaintiff suffered and continues to suffer great mental and emotional harm, anguish, insecurity, self-revulsion, damage to his self-esteem, and self-worth, shame and humiliation, including but not limited to: severe and clinical depression, anxiety, loss of sleep, and change of appetite.

100. Plaintiff has required medical and psychological care as result of the malfeasance and nonfeasance of Defendants. This has caused Plaintiff to incur expenses for medical care, treatment, and expenses incidental thereto.

101. As a result of the mental distress described above, Plaintiff has suffered serious psychological injury, loss of community reputation, medical expenses, and to incur severe financial obligations in order to retain attorneys to seek redress against the unlawful conduct of the Defendants, as well as deprivation of his liberty, invasion of his privacy, and grievous mental suffering, all to his damage in an amount in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00).

102. The acts, conduct and behavior of the Defendants were performed willfully, intentionally, oppressively, fraudulently and maliciously, by reason of which Plaintiff, is entitled to punitive damages in a sum in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00).

103. It has been necessary for Plaintiff to obtain the services of an attorney to prosecute this action, and Plaintiff is entitled to an award of attorney's fees and costs of suit incurred herein.

## SIXTH CAUSE OF ACTION

### *INJUNCTIVE AND DECLARATORY RELIEF*

104. Paragraphs 1 through 103 inclusive are incorporated by reference.

105. Defendant actions of removing Plaintiff from the medical school and preventing Plaintiff from graduating from the University and the placing of notations of any accusations, findings, or sanctions against him, in Plaintiff's student file or upon his transcript, is unjust and illegal.

106. As a result of Defendant's arbitrary, capricious, and unlawful actions, Plaintiff has been prevented from attending classes at Ross, thus halting and destroying his ability to complete his medical program or to ever enter his chosen profession, thus the actions of Defendants will cause Plaintiff to suffer immediate and irreparable harm if he is not permitted to enroll in the Ross University Medical School program, retake the Step 1 examination, and complete his graduation requirements.

107. That due to Defendants' arbitrary and capricious and unlawful actions, Plaintiff has a reasonable probability of success on the merits of his case.

108. The harm caused by Defendant is irreparable and can only be mitigated by the reinstatement of Plaintiff as a student and omission of any notations. For that reason, Plaintiff is entitled to an order requiring Defendants to immediately allowing him to enroll in the medical school, allow him to retake the Step 1 examination, and remove any notations of any accusations, findings or sanctions, and prohibiting Defendants from further unlawfully interfering with Plaintiff's educational future.

109. As a result of the acts committed against Plaintiff, he has been damaged all in an amount in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00).

110. As a result of Defendants' intentional conduct, they have caused Plaintiff to incur attorney's fees and thus Plaintiff is entitled to an award of attorney's fees and costs of suit incurred herein.

***WHEREFORE***, Plaintiff prays that this Honorable Court enter judgment in Plaintiff's favor, and against the Defendants, and each of them:

1. For compensatory damages in an amount in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00);

2. For punitive damages each in an amount in excess of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00);

3. For Injunctive Relief, including reinstating Plaintiff in the medical school and allowing him to retake the Step 1 examination; and

4. Together with the costs and disbursements of this action and such other attorney's fees pursuant to statute or rule, and further relief as justice requires.

DATED this 10th day of April, 2012.

**THE BACH LAW GROUP, PLLC**

*Jason J. Bach, Esq.*
JASON J. BACH, ESQ.
Federal Bar No. 24071556
2802 Flintrock Trace, Suite 255
Austin, TX 78738
Tel.: (512) 879-3901
Fax: (800) 580-9167
Attorney for Plaintiff